UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHARLESTON HUTCHERSON,                     No. C 11-2863 WHA (PR)

          Petitioner,                    **ORDER DENYING PETITION FOR WRIT
OF HABEAS CORPUS**

   v.

GEORGE NEOTTI, Warden,

          Respondent.

_____/

## INTRODUCTION

This is a federal habeas corpus action filed by a state prisoner pursuant to 28 U.S.C. 2254. Respondent was ordered to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it. Petitioner did not file a traverse. For the reasons set forth below, the petition is **DENIED**.

## STATEMENT

In Monterey County, petitioner was charged with one count of possession for sale of cocaine base, one count of possession for sale of a controlled substance, misdemeanor possession of drug paraphernalia, and resisting, delaying or obstructing a public officer. The charging information also alleged that petitioner had suffered three previous strike convictions under Cal. Penal Code 1170.12(c)(2) and four prior prison terms.

After a jury trial, petitioner was found guilty of all charges on February 4, 2009. The trial court found the allegations of prior prison terms and prior convictions true after petitioner waived a

jury trial on those issues.  On April 3, 2009, petitioner's motion to strike two of the three strike

priors was granted, and he was sentenced to a prison term of 14 years (Exh. A).  The California

Court of Appeal subsequently affirmed the judgement in an unpublished opinion on January 31,

2011 (Exh. F).  The California Supreme Court denied petitioner's petition for review (Exh. J).

The following statement of facts is taken from the reasoned decision of the California Court

of Appeal.

A.    *Prosecution's case*

1.    *Detective Robert Gonzalez's Testimony*

Detective Gonzales, assigned to the narcotics division of the Monterey
County Sheriff's Department, testified that he participated in a search of room 120 at
the Country Inn hotel in Salinas at approximately noon on March 26, 2008.  He,
along with several other deputies, announced their presence and knocked on the door
to the room, which was ajar, before entering. [Petitioner did not immediately comply
with the officers' demands, but after a brief struggle, Gonzales was able to place
petitioner into handcuffs.]

. . . .

2.    *Detective Brian Pickens' Testimony*

Detective Pickens, who qualified as an expert in possession for sale of
controlled substances, testified that he participated in the search on March 26, 2008.
Prior to that day, deputies had been conducting surveillance at the hotel, and
determined that Hutcherson and a codefendant, Barbara Kapisi, were living in room
119.  As the designated case agent, Pickens was responsible for interviewing
suspects and witnesses, writing the primary report and making assignments to the
other deputies on the scene.

. . . .

Once the officers succeeded in handcuffing Hutcherson and tried to stand him
up, Pickens saw a clear plastic baggie on the bed, underneath Hutcherson's chest.
Pickens testified that the baggie was not on the bed when he first entered the room.
Hutcherson kept resisting the officers' efforts to stand him up, and forced himself
back down on the bed.  Each time he pulled himself down onto the bed, Hutcherson
used his shoulder to move the baggie towards the edge of the bed and onto the floor.
Once the baggie fell onto the floor, Hutcherson stopped resisting and stood up,
though he immediately turned and tried to kick the baggie underneath the bed.  At
that point, Hutcherson's demeanor changed.  He became very angry, asking the
police why they were there and saying that he was simply visiting his girlfriend.

The baggie, which was twisted and tied shut, contained yellowish tan rocks,
subsequently determined to be cocaine base or crack cocaine.  The gross weight of
the baggie and cocaine was 9.4 grams.  Pickens explained that crack cocaine is
fashioned by placing powder cocaine in a glass jar, along with water and baking soda.
The ingredients are heated until they combine and the solution is separated and dried.

2

United States District Court

For the Northern District of California

At that point, the crack cocaine can be ingested or smoked, often by use of a glass pipe.

Pickens testified that, inside a nightstand drawer, the deputies found a glass crack pipe with powdered remnants of cocaine, a Brillo pad (used to filter impurities from the cocaine) and burn marks, indicating that it had been used.  At the foot of the bed, deputies found a porcelain plate with another baggie, a spoon, a small rock of crack cocaine and another used crack pipe.  In a zippered baggie on the dresser, there was an operational digital scale with the weighing area containing a white or off-white substance Pickens suspected was cocaine, another used crack pipe, Brillo pads, a folding knife, a couple of razors and spoons.  Pickens testified that digital scales are commonly used for weighing controlled substances, so that the person selling drugs could be sure that the proper amount was being delivered to the buyer.

In addition, near a microwave, there was a Mason jar containing a bi-layered solution with a "cloudy, milky looking substance" at the bottom of the jar.  Pickens's suspicion that the jar was being used to convert powder cocaine to crack cocaine was confirmed when he interviewed Kapisi.  During that interview, Kapisi said she had made crack cocaine in that jar.

Underneath the bed, officers found a shoe box, which contained multiple "cornered sections of the . . . bag[gie] which had been torn off."  According to Pickens, the corner sections of such baggie are common packaging for rock or crack cocaine."  In addition, officers discovered $700 in cash in the zippered pouch of a Teletubby on the entertainment center.

Pickens believed that, based on his training and experience, the crack cocaine in the baggie, which he first saw underneath Hutcherson's chest on the bed, was possessed for sale.  He based his opinion on the physical evidence in the room, including the amount of cocaine in the baggie that was on the bed, the packaging, the digital scale, the knives, razors, baggie corners, the $700 in cash, and also that "our information was that Mr. Hutcherson was selling cocaine out of the room."

On cross-examination, Pickens admitted that none of the items seized from the room was submitted for fingerprint analysis.

### 3.    Detective Daniel Karamitis's testimony

Detective Karamitis was assigned to collect and document the evidence seized from the search of the room.  At the point that he entered the room, the other officers were attempting to place Hutcherson in handcuffs.  Once they did so, they tried to stand him up, but Hutcherson kept going back down to the bed, and Karamitis observed a plastic baggie underneath him.

Karamitis photographed the closet of the room, and testified that it contained both male and female clothing, with the male clothing arranged from the midpoint to the right and and the female clothing arranged from the midpoint to the left.  He estimated that there were 15 to 20 items of male clothing and a similar number of items of female clothing in the closet.

In addition to the baggie with crack cocaine, officers found a plastic baggie containing 3.9 gross (i.e., including the weight of the baggie) grams of marijauna.  Karamitis also photographed the crack pipe in the bedside table, a crack pipe next to the bathroom sink, and indicia with Hutcherson's name on it which was also found in

3

United States District Court

For the Northern District of California

the room.

### 4.     *Patrick Pata's testimony*

Pata is the manager of the Country Inn hotel, and explained that he obtains identification from guests and has them fill out a card when they register.  He checks the identification against the information filled out on the card before taking their money and providing a key.  Pata then marks the card each day that the rent for a particular room is paid.  According to Pata's cards, Hutcherson checked into the hotel on March 3, 2008 and stayed for one week.  Another card showed that Kapis checked into Room 120 on March 22, 2008 and checked out on March 25, 2008.  Pata did not know who occupied room 120 on March 26, 2008.

### B.     *Defense case*

Kapisi testified she had known Hutcherson for about a year.  She was staying in room 120 at the Country Inn hotel on March 26, 2008, and left the room at about 1:30 p.m. that day.  Hutcherson, who had been sleeping, was just getting up to go to the bathroom when she left.  Kapisi had picked him up at his house in Seaside about 2:00 or 3:00 that morning because his family had called her and asked that she take Hutcherson to the hospital as he had a very high fever.  Kapisi had taken Hutcherson to the hospital three days earlier because a cut on his hand had gotten infected, but he refused to go again that morning, so she took him to the hotel instead and covered him with some wet towels.

Kapisi said that she had made the crack cocaine found in the hotel room by cooking up powder cocaine, baking soda and water in the Mason jar.  She had prepared it the night before, and she got the powder cocaine from one of her "dates."[1] Just before she left the room and was arrested, she had been smoking crack cocaine, and claimed that all the cocaine, as well as the marijuana and crack pipes, found in the room was hers.  Kapisi had already pleaded guilty to possession of a controlled substance at the time of Hutcherson's trial, though she had not yet been sentenced.

On cross-examination, Kapisi testified that though she was initially just friends with Hutcherson, she has fallen in love with him since their incarceration. She denied that he was her pimp.

She further testified that she had been staying in the room by herself, though she sometimes had clients there.  On occasion, she would smoke crack cocaine with her clients, including Hutcherson, but he did not smoke any on the day they were arrested because he was sick in bed.

Kapisi said Pickens took her into the room next door to talk to her, and she told him that room 120 was hers and Hutcherson was not involved in any way.  She denied telling Pickens that "[Hutcherson] knows people" and if she told him anything, Hutcherson would "get them to hurt me."  She also denied telling him that she stayed in the room with her "boyfriend, Hutcherson."  Kapisi explained that she rented a room under Hutcherson's name sometimes when she did not haver drivers's licence or other identification.  Hutcherson had rented a room with another girl about 10 days prior to their arrest.  He left after one day, but Kapisi asked him to keep the room in his name and she stayed there by herself for a few days until she got her

---

[1] [Footnote 2 in original] Kapisi admitted that she was a prostitute.

identification.

Kapisi testified that she told police from the beginning that everything in the room was hers. She denied that Hutherson yelled at her from the other room to say that the room was hers and take responsibility for it. She never told law enforcement about picking Hutcherson up to take him to the hospital and him refusing to go, because they never asked her. Kapisi also claimed that the $700 in the Teletubby was money she made from prostitution and that she asked Pickens not to take it. She denied asking him not to tell Hutcherson about the money.

Kapisi admitted she had several prior felony convictions, including convictions for petty theft with a prior, possession of marijuana for sale and transportation of controlled substances.

### C.      Rebuttal evidence

California Highway Patrol Officer Kellie Lindholm testified that she detained Kapisi in the parking lot of the hotel on March 26, 2008. Lindholm could hear a commotion coming from that room which died down, and she could hear Hutcherson yelling, "Hey, baby, they think this is my room. . . . Hey, baby, tell them this stuff's yours." After Kapisi was handcuffed, Lindholm took her into the hotel room next to the one where the other officers were searching. Pickens came into the room and began to interview Kapisi. As soon as Pickens asked Kapisi about Hutcherson's involvement with the controlled substances found in the next room, Kapisi immediately said she did not want to talk about that. She was crying and trembling. Kapisi said that Hutcheron knew people who could hurt her. She never mentioned picking Hutcherson up earlier that morning or that he was ill.

When Pickens asked her what items in the room belonged to her, Kapisi claimed the jar of liquid which she used to make cocaine base, the smoking paraphernalia and a loose rock of cocaine base on the floor at the foot of the bed. She said she had rented the room the past couple of times, but she and Hutcherson had rented other rooms under his name. Lindholm did not recall Kapisi mentioning a baggie full of crack cocaine, but she was very interested in the Teletubby and told Pickens that was her money she made from prostitution. She begged him not to take it and asked him not to tell Hutcherson about it, saying, "He doesn't know about that money."

Exh. F 2-8.

# ANALYSIS

## A.    STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d). The first prong applies both

5

to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09 (2000), while the second prong applies to decisions based on factual determinations, *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of Section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412–13. A state court decision is an "unreasonable application of" Supreme Court authority, and falls under the second clause of Section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409.

**B.     ISSUES PRESENTED**

As grounds for federal habeas relief, petitioner asserts that: (1) he was denied due process by the admission of Detective Pickens' statement and; (2) he was denied his right to confront and cross-examine witnesses.

1. Admission of Statement

Petitioner maintains that his due process rights were violated by the admission of Detective Pickens' testimony that one of the bases for his opinion that the drugs found in the hotel room were possessed for sale was "our information was that Mr. Hutcherson was selling cocaine out of the room" (Exh. F 3-5). According to petitioner, admission of this testimony rendered his trial fundamentally unfair. This claim was addressed in a detailed, reasoned opinion on direct appeal.

> Before trial commenced, Hutcherson brought a motion, joined in by Kapisi, to disclose the identity of the confidential informant relied upon to obtain a search warrant for the room where Hutcherson was staying on March 26, 2008. Hutcherson contended the informant was a material witness, whose information provided the sole basis for the warrant, and thus disclosure of the informant's identity was necessary to ensure a fair trial. The prosecution countered that the informant was not a percipient

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

witness to the charged offenses and thus not material.  In his affidavit supporting the search warrant, Pickens stated that the informant had purchased cocaine from "Baby D," within 10 days of March 25, and that "Baby D" was later identified at Hutcherson. [footnote omitted]

Before trial, Hutcherson brought in limine motions to exclude evidence that the police were at the hotel pursuant to a search warrant and to exclude evidence of the controlled buy conducted by the confidential informant before the search warrant was executed.  As to the search warrant question, the prosecution was reluctant to concede this point, as it was concerned the jury might believe the search was motivated by racial bias.  When the trial court asked Hutcherson's counsel if he would stipulate that the search was lawful, counsel agreed to do so.  The trial court directed counsel to "phrase your stipulation as you want during the course of the trial.  If that stipulation is satisfactory to the People, then I will exclude 'search warrant.'"

With respect to the motion to exclude evidence of the confidential informant's controlled buy, the prosecution argued that it would not be using such evidence in the case in chief, but "if there's cross-examination of the expert as to his basis of opinion, then that would open the door to the fact that that was something the expert did consider for the reason why he believes it was Mr. Hutcherson who was selling controlled substances."  In response, Hutcherson's counsel argued that "the issue, as far as we're concerned, isn't whether the drugs were possessed for personal use or for sale.  It's whether they were possessed by [Hutcherson] at all.  So I don't intend to go there with the expert."  The trial court deferred ruling on the motion, leaving it "open for later argument."

During his direct examination, after Pickens was asked if he was involved in the search on room 120, the prosecutor asked, "prior to the execution of the search warrant search, was there any surveillance done of the County Inn?"  Defense counsel did not object.

The prosecutor subsequently asked Pickens what factors led him to conclude that the cocaine found in the baggie underneath Hutcherson was possessed with the intent for sale.  He responded, "the [sheer] amounts, 9.4 gross grams.  In addition the packaging located inside the room.  The fact that a scale was present.  The knives and razors were present for the breaking or chunking off of crack cocaine. [¶] In addition, underneath the bed we located a shoe box, which had cornered sections of the sandwich bag[gies] which had been torn off.  Those cornered sections of bag[gies] are common packaging for rock or crack cocaine.  There were multiple amounts of bag[gies] in that shoe box underneath the bed.  [¶] Plus the fact that the $700 was located inside the Teletubby on the entertainment center.  *And, in fact, our information was that Mr. Hutcherson was selling cocaine out of the room.*  All those [sic] leads me to believe that that particular cocaine was possessed with the intent to sell."  (Italics added.)

Defense counsel asked to approach, and outside the presence of the jury, moved for a mistrial on the grounds that the testimony violated the court's order excluding information and was "probably some of the most damning evidence we could have now."  Defense counsel argued that the error could not be remedied, as he could not cross-examine Pickens on the matter without highlighting the evidence for the jury.

The trial court denied the motion without prejudice, stating that the testimony at issue "was in the string of several things the officer was testifying about" and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court

For the Northern District of California

indicated that it did not believe the testimony was so prejudicial that it could not be corrected by way of instructing the jury. When the jurors returned, the trial court instructed them, as follows: "The officer has testified as to the basis for his opinion that the cocaine found in the room was, in his opinion, possessed for the purposes of sales. Included in his answer was a reference to information they had, which is unreliable, inadmissible evidence. [¶] The Court is striking that reference to the information they had. You are not consider that portion of his testimony for any purpose whatsoever. You are to ignore it. And the Court has stricken that."

### 2.   *Analysis*

Hutcherson asserts that the prosecution "violate[ed] . . . the court's ruling[]" by referencing the search warrant and also that the prosecutor "either . . . recklessly neglected to inform his officer of the judge's ruling (made just the day before), or the office chose to violate that ruling." With respect to the reference to the search warrant, Hutcherson's counsel failed to object to the prosecutor's question and accordingly, has forfeited the claim on appeal. (Evid. Code § 353, subd. (A); *People v. Letner and Tobin* 50 Cal. 4th 99, 159.)

As to Hutcherson's motion to exclude reference to the controlled buy, the record does not indicate that the trial court ever ruled on this issue, and thus it is not clear what the prosecutor was supposed to instruct Pickens in what he could and could not say. However, even if the court did preclude any reference to the controlled buy or the confidential informant, Pickens's statement did not strictly violate that restriction since he referenced neither, instead making an oblique reference to "information."

### a.   *No due process violation*

Furthermore, we find no due process violation from the supposed error. The court in *Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 919, stressed that the due process inquiry is whether admission of the challenged evidence so fatally infected the proceedings as to render them fundamentally unfair and concluded that "[o]nly if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." (*Id.* at p. 920.)

Here, there was at least one permissible inference the jury could draw from Pickens's testimony that the police had information that Hutcherson was selling cocaine from that location, namely that that was the reason why police went to the hotel and searched the room in the first police. It is not as if Pickens stated that Hutcherson was *in fact* selling cocaine out of the hotel room, or that the information had been corroborated in any way, such as by a controlled buy carried out by a confidential informant or undercover officer.

### b.   *No error in denying motion for mistrial*

"'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'" (*People v. Wharton* (1991) 53 Cal. 3d 522, 565.) On appeal, we review the denial of a motion

8

United States District Court

For the Northern District of California

1
2
3

for mistrial under the deferential abuse of discretion standard.  (*People v. McLain* (1988) 46 Cal. 3d 97, 113.)  The trial court is in a much better position to assess any prejudicial impact the incident might have, as well as the ability of curing it by instruction or admonition.  (See *People v. Hardy* (1992) 2 Cal. 4th 86, 213.)

4
5
6
7
8
9

   In most cases, "the trial court is permitted to correct an error in admitting improper evidence by ordering it stricken from the record and admonishing the jury to disregard it, and the jury is presumed to obey the instruction."  (*People v. Hardy* (1948) 33 Cal 2d 52, 61 (*Hardy*).)  "'A jury is presumed to have followed an admonition to disregard improper evidence particularly where there is an absence of bad faith. [Citations.] It is only in the exceptional case that "the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions."'" (*People v. Olivencia* (1988) 204 Cal. App. 3d 1391, 1404.) The exceptional case is where the incompetent evidence goes to the main issue *and* where the proof of defendant's guilt is not clear or convincing.  (*Hardy, supra*, at p. 61.) Under those circumstances, the error in admitting the incompetent evidence cannot reasonably be cured by striking it out and instructing the jury to disregard it.  (*Ibid.*)

10
11
12
13
14

   Here the trial court struck Pickens's testimony and instructed the jury to disregard it.  There was no further reference to it in testimony or argument to the jury. The objectionable statement was the last in a litany of reasons offered by Pickens to support his opinion that the cocaine base in the baggie was possessed for sale.  That list of reasons included the weight of the cocaine base contained in the baggie, along with other paraphernalia such as the cutting instruments, scales and box of sandwich baggies with the corners ripped off, all of which Pickens testified was commonly used in preparing and packaging cocaine base for sale.

15
16
17
18

   In addition, the jury heard the officers describe their intitial struggle with Hutcherson and how they observed a baggie on the bed underneath him, which Hutcherson attempted to scoot off the bed while handcuffed.  That baggie contained the cocaine base that Pickens opined was possessed for sale.  Though Hutcherson contends that a photograph of the bed belies the officers' testimony about a struggle on the bed, it is not this court's place to second-guess the jury's assessment of witness credibility.  (*In re Casey D.* (1990) 70 Cal. App. 4th 38, 52-53.)

19
20
21
22
23

   Along those same lines, the jury was entitled to disbelieve Kapisi's testimony, which was suspect in many ways.  For example, she testified that the room was hers alone and she used it to entertain clients, yet the photographs of the room showed that at least half of the closet contained men's clothing.  Furthermore, rooms at the hotel were sometimes registered in her name and sometimes in Hutcherson's name.  When interviewing Kapisi at the scene, Lindholm heard Hutcheron yelling at her to claim ownership of the drugs.  Kapisi was crying and trembling and told the officers that Hutcherson knew people who could hurt her.  A reasonable juror could conclude that Kapisi's testimony was fabricated.

24
25
26

   Although the improper testimony went to one of the main issues in the case, specifically the charge of possession of crack cocaine for sale, given the overwhelming evidence supporting a conviction on that charge, we presume that the court's prompt admonition was sufficient to cure any potential prejudice and therefore the motion for mistrial was properly denied.

(Exh. F 9-15).

27
28

   The rejection of this claim by the state appellate court was neither contrary to nor an

9

United States District Court

For the Northern District of California

1    unreasonable application of clearly established United States Supreme Court authority. In addition,

2    the state court's decision was not based on an unreasonable determination of the facts.

3           Petitioner's burden in demonstrating a due process violation based on an evidentiary decision

4    is substantial. *Boyde v. Brown*, 404 F. 3d 1159, 1172 (9th Cir. 2005). The admission of evidence is

5    not subject to federal habeas review unless a specific constitutional guarantee is violated or the error

6    is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due

7    process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984,

8    990 (9th Cir.). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or

9    overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the

10   writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's

11   admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit

12   precedent but not contrary to, or an unreasonable application of, clearly established Federal law

13   under Section 2254(d)). The due process inquiry in federal habeas review is whether the admission

14   of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v.*

15   *Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990. Only if there are *no* permissible

16   inferences that the jury may draw from the evidence can its admission violate due process. *See*

17   *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

18          In petitioner's case, as the state court reasonably found, there was a permissible inference

19   that the jury could have drawn from the improper testimony. *See Jammal*, 926 F. 2d at 920. It

20   would have been permissible for the jury to infer that the police's information that Hutcherson was

21   selling cocaine "was the reason the police went to the hotel and searched the room in first place"

22   (Exh. F 13). Moreover, the jury was instructed that the statement was inadmissible, was not to be

23   considered, and was unreliable (Exh. F 11-12). Juries are presumed to follow the instructions given

24   to them, *see, e.g. Weeks v. Angelone*, 528 U.S. 225, 234 (2002); *Richardson v. Marsh*, 481 U.S. 200,

25   211 (1987), and petitioner can point to no evidence indicating that the jury in his case ignored the

26   trial court's instructions.

27          Furthermore, petitioner has not shown that any alleged error was prejudicial to him. Even if

28

10

a petitioner meets the requirements of Section 2254(d), habeas relief is warranted only if the constitutional error at issue had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).  Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637, citing *United States v. Lane*, 474 U.S. 438, 439 (1986).  Here, there was significant evidence against petitioner both that he possessed the cocaine and that he possessed it for sale (Exh. F 14-15).

In addition, petitioner's defense, which consisted mainly of Kapisi's testimony, was weak. As the state court reasonably found and as the record confirms, "[a] reasonable juror could [have] conclude[d] that Kapisi's testimony was fabricated" (Exh. F 14).  Given the strength of the evidence against petitioner and the weakness of his defense, petitioner cannot establish that any error regarding Pickens' testimony was prejudicial to him. *Brecht*, 507 U.S. at 637.  This claim must be denied.

2. Confrontation and Cross-Examination

Petitioner's second claim is also related to the testimony of Detective Pickens.  Petitioner maintains that Pickens' statement that "And, in fact, our information was that Mr. Hutcherson was selling cocaine out of the room" (Exh. F 11) violated petitioner's Sixth Amendment right to confront the witnesses against him, because he was not permitted to cross-examine whomever provided the "information" referred to in Pickens' statement.

The Confrontation Clause, which establishes that certain evidence must be subject to cross-examination, applies to all "testimonial" statements. *Crawford v. Washington*, 541 U.S. 36, 50-51 (2004).  "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51.  In support of his argument, petitioner relies primarily on *Bruton v. United States,* 391 U.S. 123 (1968), where a Confrontation Clause violation was found based on admission into evidence of statements by a non-testifying co-defendant implicating Bruton.

Petitioner cannot demonstrate that the rejection of this claim by the state appellate court was

1    either contrary to or an unreasonable application of, clearly established United States Supreme Court

2    authority.  To begin with, Pickens' referred to the "information" that petitioner was selling cocaine

3    as one of the numerous reasons he believed the cocaine was possessed for sale, and not for the truth

4    of the matter asserted.  As the Supreme Court has stated, the Confrontation Clause is not implicated

5    by evidence admitted for a non-hearsay purpose.  *Crawford*, 541 U.S. at 59, n. 9.  Furthermore,

6    under California law, admission of expert testimony[2] based on out-of-court statements does not

7    "typically offend confrontation clause protections" because the expert may be cross-examined and

8    "the material on which the expert bases his or her opinion are not elicited for the truth of their

9    contents; they are examined to assess the weight of the expert's opinion."  *People v. Sisneros*, 174

10   Cal. App. 4th 142, 154.  Petitioner can cite to no clearly established United States Supreme Court

11   authority that is to the contrary.  Finally, as discussed in detail *supra*, the trial court struck the

12   statement in question, instructed the jury to disregard it, and also informed the jury that the statement

13   was unreliable and inadmissible  (Exh. F 11-12).

14           Furthermore, *Bruton*, which petitioner relies on in support of his argument, is not applicable

15   to this case.  In *Bruton*, the defendant and co-defendant were tried together; the co-defendant's

16   hearsay confession, which contained statements implicating defendant, was admitted into evidence,

17   and the Supreme Court found that an instruction from the trial court could not cure the resultant

18   prejudice to defendant Bruton.  *Bruton*, 391 U.S. at 135-36.  Here, as detailed *supra*, there was no

19   hearsay statement admitted into evidence; rather, "the objectionable statement was the last in a litany

20   of reasons offered by Pickens to support his opinion that the cocaine base found in the baggie was

21   possessed for sale" (Exh. F 14).

22           Moreover, even if petitioner had established a Confrontation Clause violation, there was no

23   prejudice resulting from the error.  Confrontation Clause claims are subject to harmless error

24   analysis.  *See United States v. Nielsen*, 371 F. 3d 574, 581 (9th Cir. 2004); *United States v. Allen*, 425

25   F. 3d 1231, 1235 (9th Cir. 2005).  For purposes of federal habeas corpus review, the standard is

---

        [2] Detective Pickens was qualified as an expert in possession for sale of controlled substances
at petitioner's trial  (Exh. F 3).

12

1  whether the inadmissible evidence had an actual and prejudicial effect upon the jury. *Hernandez v.*

2  *Small*, 282 F. 3d 1132, 1144 (9th Cir. 2002); *Brecht*, 507 U.S. at 637.   As discussed *supra,* there was

3  significant admissible evidence against petitioner both that he possessed the cocaine and that he

4  possessed it for sale (Exh. F 14-15).  Furthermore, petitioner's defense, which consisted mainly of

5  Kapisi's testimony, was weak.  Given the strength of the evidence against petitioner and the

6  weakness of his defense, petitioner cannot establish that any error regarding Pickens' testimony was

7  prejudicial to him. *Brecht*, 507 U.S. at 637.   This claim must be denied.

8                                                      **CONCLUSION**

9            For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

10          Rule 11(a) of the Rules Governing Section 2254 Cases now requires a district court to rule

11  on whether a petitioner is entitled to a certificate of appealability in the same order in which the

12  petition is denied.  Petitioner has failed to make a substantial showing that his claims amounted to a

13  denial of his constitutional rights or demonstrate that a reasonable jurist would find the denial of his

14  claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Consequently, no

15  certificate of appealability is warranted in this case.

16          The clerk shall enter judgment and close the file.

17          **IT IS SO ORDERED**.

18  DATED: March __26__, 2012

19                                                                          WILLIAM ALSUP
                                                                            UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25  C:\Documents and Settings\USDC\Local Settings\Temp\notes56FD74\HutchersonFinalOrder.wpd

26

27

28

United States District Court
For the Northern District of California

13